Jerald L. KENDRICK, et al., Plaintiffs,

v.

David H. BLAND, et al., Defendants.

Civ. A. No. 76–0079(P).

United States District Court,
W. D. Kentucky,
Paducah Division.

Nov. 12, 1981.

Oliver H. Barber, Jr., Gittleman, Charney & Barber, Louisville, Ky., Richard H. Burr, III, Southern Prisoners Defense Committee, Nashville, Tenn., for plaintiffs.

Shawn Moore, Adjoa A. Burrow, Martha A. Fleetwood, U. S. Dept. of Justice, Civil Rights Div., Sp. Litigation Section, Washington, D. C., for amicus curiae.

Paul Isaacs, Barbara Willett, Dept. of Justice, Commonwealth of Kentucky, Frankfort, Ky., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

JOHNSTONE, District Judge.

This action is before the Court for final decision on the issue of guard harassment. This action was brought under 42 U.S.C. § 1983 by prisoners at Kentucky State Penitentiary (KSP) who alleged their conditions of confinement were cruel and unusual punishment violative of the Eighth Amendment to the U. S. Constitution. This Court en-tered a preliminary injunction prohibiting the use of unnecessary physical force, mace, or restraints on any inmate on March 21, 1980. A Consent Decree (Appendix I to this Opinion) regarding a broad range of prison conditions, was approved by the Court and entered as an order on May 28, 1980. The Court, with agreement of the parties, entered a Supplemental Partial Consent Decree (Appendix II to this Opinion) on July 22, 1980, which, among other things, made permanent the preliminary injunction previously entered. During the Week of July 21–25, 1980, this Court held a trial on the issue of guard harassment at KSP, an issue specifically excluded from the Consent Decree and now ready for final disposition by the Court.

With the entry of the Supplemental Partial Decree, the issues in the guard harassment trial were narrowed to the two disputed forms of relief sought by the plaintiffs. First, plaintiffs seek a declaration that the Constitutional rights of the KSP class had been violated by a pattern of guard harassment of inmates. Second, plaintiffs request an injunction ordering the firing of Senior Captain (now Major) Robert Hendricks, Captain William Henderson, and Captain Billy Ashley. Plaintiffs originally sought the termination of Lieutenant Dixon Copeland and Officer Charles Holt, but that request has been withdrawn. This Court indicated, in a bench opinion rendered October 22, 1980, that a preliminary finding of an unacceptable pattern of harassment had been made.

Since this action was initiated by plaintiffs, acting pro se, conditions at the Penitentiary have changed. The gravity of the situation at the prison prior to the institution of this lawsuit is illustrated by a few grim statistics. Within a one year period beginning in January 1974, eight inmates committed suicide. In the fifteen month period immediately prior to the filing of this action, seven more inmates were the victims of homicide or suicide. (See Report on Homicides and Suicides in Kentucky State Penitentiary, filed by defendants on August 28, 1980). By contrast, there have

been no suicides and one homicide at KSP in the last two years.

The institution was constructed in the early 1880s. Cellhouses No. 1 and No. 2 have never been thoroughly renovated in the one hundred years of KSP's existence. They are, in all probability, the oldest prison cellhouses in the nation still used in their nearly original condition.

This is part of the sobering background against which the Court must judge the issue of guard conduct. For just as the Consent Decree requires renovation of the bricks and mortar of the prison, so too must the attitudes of prisoners and corrections personnel be renovated to ensure progress that will satisfy the mandate of the Constitution.

## FINDINGS OF FACT

### A. THE ABUSE OF THE INFORMANT SYSTEM

1. In the years prior to the filing of this action and continuing through the period immediately preceding the hearings on guard harassment, a coercive informant system operated inside the prison. Guards would offer rewards to, or withhold disciplinary action against, inmates who would cooperate with them by giving them desired information. The abuse of this system created a pervasive atmosphere of fear, intimidation, dishonesty, and sometimes violence.

2. Illustrative of the pernicious effect of the informant system is the testimony concerning the activities of Inmate Blair Shelton. While the Court finds that Mr. Shelton exhibited an exaggerated version of his own ability to manipulate the system, the record clearly demonstrated his abuses of the system were severe and were in fact fostered and facilitated by the officials in authority at KSP.

3. Inmate Shelton was a known loan-shark, drug-dealer and homosexual aggressor. Although Shelton was known by prison officials to be a loan-shark [Transcript of Hearing, p. 677], he was assigned to jobs in the Protective Custody Unit, first as recreation director, then as inmate clerk, which gave him the maximum amount of freedom to engage in loan-sharking activity. His inmate jobs allowed him to be out of his cell and to move about the cellhouse at will during all waking hours. He was able to obtain these jobs (and the mobility, status, and power they conferred on him) without going through the normal channels or approval of the Classification Committee of the institution. (TH 269, 996–97).

4. In April, 1977, Mr. Shelton was transferred to segregation due to his loaning of money to other inmates. Shortly after his transfer, administration officials offered to allow Shelton to return to Protective Custody in return for his help in building a case against Inmate James Collins (who had filed a lawsuit over conditions in Protective Custody). Shelton agreed to cooperate on the condition that he be allowed to cell with his former cellmate, nineteen year old George Simpson (with whom he had a homosexual relationship). This previous celling arrangement had violated the institutional rule against inmates over 25 years of age (Shelton was 35 at the time) celling with inmates under 25. Upon his return to Protective Custody, Shelton was placed in the cell next to Simpson, who at that time had no cellmate. Mr. Shelton protected his homosexual relationship with Simpson by resuming his loan-sharking activities. (TH 264–270).

5. Though Shelton fell into disfavor with the officers in charge of Protective Custody, those officers, as late as the Spring of 1980, allowed cell-changes that enabled Shelton to engage in predatory, violent homosexual activity. In April of 1980, a seventeen year old inmate was transferred to Protective Custody at KSP. Within a week of his arrival, he was transferred without notice and against his will to Mr. Shelton's cell. For the remaining period he was in Protective Custody (over three months), this seventeen year old inmate was forced to fight off the homosexual advances of Shelton almost every night. Shelton engineered this cell-change by bribing the inmate grievance clerk. But all cell changes must be authorized by the shift captain and,

ultimately, by Major Hendricks. Those officers must bear ultimate responsibility for the cell changes and the abuse of the informant system to which they are connected. (Deposition of Inmate James Chapman, TH 273, 680, 787–88, 992–94).

6. In addition to the kind of activity described above, the informant system led to the imposition of arbitrary and harsh disciplinary action against inmates who failed to cooperate with guards in the desired manner. Illustrative of this abuse of the informant system is the imposition of six months confinement in segregation of Inmate Gary Herndon. Mr. Herndon was asked to cooperate in building a case against a guard suspected of smuggling contraband. Herndon declined to give any information for the reason he claimed to know nothing about the situation. Herndon alleges Captains Henderson, Ashley and Deboe threatened him with retaliatory action if he failed to cooperate (TH 72–76).

7. Herndon, who has a bad reputation for loan-sharking and homosexuality within the institution (TH 672–73), felt the threats of the officers placed him in serious jeopardy, both from official action against him by the officers and from inmates who might think he had informed on them. He reported the threats to Warden Sowders and sought a State Police investigation. Warden Sowders testified he viewed the charges as being "very serious." Herndon offered to submit to a polygraph test and Warden Sowders did request a State Police investigation. The State Police assigned a Detective Potter to investigate, although the inmates objected to Potter's involvement due to his ties to the accused guards (TH 71, 707–10).

8. Detective Potter's investigation yielded no action (TH 72). Herndon offered to submit to a polygraph test (TH 71), but no polygraph test was given, even though it was standard procedure to use a polygraph in this situation, according to Warden Sowders (TH 709). The evidence clearly shows that Herndon feared official misconduct in the form of guard harassment in retaliation for his noncooperation. Nevertheless, Detective Potter failed to investigate the possibility that certain guards misused their official positions to coerce inmates into giving or fabricating desired information. As Detective Potter testified, "I didn't go that deep into it." (TH 977).

9. Soon after the alleged threats by the guards, and the aborted State Police investigation, guards began searching Herndon's cell on a daily basis. Within a few days, one marijuana cigarette was found. Herndon pleaded not guilty and his cellmate pleaded guilty to possession before the institutional Adjustment Committee. Both were sentenced to ninety days segregation. Thereafter, Herndon's confinement in segregation was extended for eighty-eight additional days for reasons which appear murky at best. Thus Herndon was confined in segregation for six months, while his cellmate, who admitted the infraction, was released after ninety days. The only apparent explanation for this chain of events and Herndon's one hundred and seventy-eight day confinement in segregation is retaliation against Herndon for his non-cooperation and attempt to expose guard misconduct (TH 72–76).

10. The conflict in testimony on allegations of guard harassment stemming from the informant system was extreme. Defendants admit that "perhaps the [alleged] incidents did occur to a limited extent," but submit there was justification or circumstances which mitigate their actions (Defendants' Brief on Guard Harassment, p. 7). The Court finds that the incidents outlined above establish a basis for finding an unacceptable pattern of harassment arising out of abuses of the informant system.

## B. MISCLASSIFICATION OF INMATES AS A SOURCE OF BRUTALITY WITHIN THE PRISON

11. Perhaps the single most disturbing problem raised in the course of this lawsuit is the status of a large number of inmates who suffer from severe mental impairments and are confined in what is known as the Special Needs Unit. These prisoners are suffering from a broad range of mental

problems. Some are certainly psychotic, others are victims of early brain injury, all are incapable of functioning in normal prison environment.

12. The confinement of Special Needs inmates in the same area with other inmates in Cellhouse No. 3 led to acts of brutality and cruel and inhuman punishment. Illustrative of the problems in this area is the testimony concerning Inmate Roy Gish, an emotionally disturbed inmate in the Special Needs Unit. While no expert testimony was presented as to the medical diagnosis of Mr. Gish, his mental illness was apparent to laymen, including both this Court (TH 871) and Captain Henderson (TH 854, 868). Mr. Gish served out his sentence and upon release was involuntarily committed to Western State Hospital (Plaintiffs' Brief on Guard Harassment, p. 13).

13. Shortly before the lunch hour on July 8, 1980, Mr. Gish became very agitated and demanded to be taken to the Administration Building because he felt he was being held unjustly in Cellhouse No. 3. Mr. Gish began shouting and Lt. Burchett, the officer on the walk where Mr. Gish's cell was located, was unable to calm him down. Soon, Captain Henderson and two other officers arrived on the scene. The four officers spent "two or three minutes" trying to convince Mr. Gish to settle down. They sought no help from a staff member trained in dealing with mentally disturbed inmates (it is unclear whether any staff adequately trained were available at the time, TH 857–858). Although there was no other disturbance at the time and according to Captain Henderson's own testimony, "the walk was completely quiet when I got there with the exception of Roy Gish" (TH 861), Captain Henderson decided it was imperative to move Mr. Gish immediately, while he was in this disturbed state.

14. Established procedure requires guards to attempt to handcuff an inmate before attempting to move him when there is a disturbance (TH 862, United States Exhibit 2). Even though four officers were on the scene, none was sent to get handcuffs. Instead, Captain Henderson (who is 6'4" and 250 lbs.) opened the cell door and, along with the three other officers, attempted to subdue Mr. Gish (who is 5'8" and 135 lbs). Captain Henderson and at least one of the other guards struck Mr. Gish in the face, stomach, and chest, then knocked him down the steps (TH 487, 497–498, 500).

15. The above described incident involving Roy Gish was not an isolated or unique occurrence. Captain Henderson has been involved in several other, similar incidents involving mentally disturbed inmates. These other occurrences include instances in which Captain Henderson struck Inmates Gary Dailey, Donald Ross, and Benny Johnson (TH 869), see also Transcripts of Hearings on September 22, 1979 and November 30, 1979. Inmate Dailey is a former patient of the Forensic Unit of Central State Hospital, who suffers from organic brain damage (Transcript of November 22 Hearing, pp. 119–20). Mr. Ross and Mr. Johnson, who are both former mental patients, were also confined in the Special Needs Unit of Kentucky State Penitentiary.

16. The guards assigned to the Special Needs Unit had not received adequate, or apparently any, training in dealing with mentally disturbed inmates (TH 869–70). Moreover, the problem was compounded by the fact that the Special Needs Unit, during the period in question was within Cellhouse No. 3, the "jail within the prison" where institutional rule violators were locked up. The institutional rule violators, including many of the most manipulative and dangerous inmates, would often exacerbate a bad situation by prodding the mentally disturbed inmates into provoking guards who were incapable of coping with the situation (TH 859–60). Many guards are, as Warden Sowders testified, "country folks. They are not sophisticated people ... but ... they have actually got that inmate's concern at heart." (TH 677). However, the placing of even well-intentioned guards in the position of dealing with inmates who are mentally ill without any training or adequate guidance, resulted in the infliction of much unnecessary cruelty and brutality. The atti-

tude of those *few guards who were less than well intentioned, and predisposed to use physical force, made matters even worse.*

## CONCLUSIONS OF LAW

1. The Eighth Amendment prohibits "cruel and unusual punishment." While it is difficult to define with precision the prohibition of the Amendment in this regard, the basic legal principle it embodies is clear. The Supreme Court succinctly stated this principle in *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958): "While the state has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards."

■ 2. The "cruel and unusual punishment" clause must be interpreted "in a flexible and dynamic manner," *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976) (joint opinion). The Supreme Court has noted that "Eighth Amendment judgments should neither be, nor appear to be merely the subjective views" of a court. *Rummel v. Estelle*, 445 U.S. 263, 275, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980). However, the most recent ruling from our nation's highest court re-affirms the proposition that "the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain'" *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981), quoting *Gregg v. Georgia, supra*, 428 U.S., at 173, 96 S.Ct., at 2925.

3. The actions of defendants at issue here must be evaluated with the purpose of determining whether they are justified by a valid penological goal. *See Gregg v. Georgia, supra*, 428 U.S., at 183, 96 S.Ct., at 2929; *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). The Supreme Court most recently set forth these goals of penal confinement by the state in our criminal justice system: "to punish justly, to deter future crime, and to return imprisoned persons to society with an improved change of being useful, law-abiding citizens." *Rhodes v. Chapman, supra*, 101 S.Ct., at 2402.

■ 4. The use of the informant system as outlined in the Court's Findings of Fact is destructive of the penological goals adopted in *Rhodes v. Chapman, supra*, and the goals of deterrence, security, and rehabilitation as evaluated in *Pell v. Procunier*, 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Such a system, when operating (as was the case here) without close supervision and strict guidelines, breeds mistrust and disrespect for authority while jeopardizing the safety and security of both prisoners and guards.

■ 5. The operation of the Special Needs Unit as described in the Findings of Fact resulted in the infliction of cruel and unusual punishment in contravention of plaintiffs' rights under the Eighth Amendment. The assignment of guards to this unit who were totally untrained in dealing with mentally ill inmates resulted in the "unnecessary and wanton" infliction of pain proscribed in *Gregg v. Georgia, supra*, 428 U.S. at 183, 96 S.Ct. at 2929. The use of physical force described in the Findings of Fact violate "standards of decency that mark the progress of a maturing society." *Trop v. Dulles, supra*, 356 U.S. at 101, 78 S.Ct. at 598.

## JUDGMENT

The Court, having adopted the Findings of Fact and Conclusions of Law listed above, is now faced with the difficult task of fashioning appropriate relief. The Court is not persuaded that the relief requested by plaintiffs—an order requiring the dismissal of Major Hendricks, and Captains Henderson and Ashley,—would remedy the conditions which give rise to the problems discerned by the Court.

The Court is cognizant of the fact that many administrative and personnel changes have been made at the prison since the time of the hearings on guard harassment. Moreover, pursuant to the Supplemental Partial Consent Decree § 3(c), defendants agreed to implement a "formal evaluation process of non-clerical correctional personnel job performance [to determine continued] fitness to work within a correctional institution." The information garnered from this process must be submitted to the Court before any further action regarding the three guards in question.

The Court believes the implementation of strict guidelines regarding the use of informants is necessary to prevent past abuses from recurring in the future. Included in these guidelines must be provisions for insuring that outside investigations of allegations of guard misconduct are conducted in a thorough, objective and impartial manner by persons free from close personal working relationships to the targets of the investigations. The Court is further of the opinion that the problems of classification and guard training and assignment regarding the Special Needs Unit must be addressed by defendants in light of current conditions at KSP.

Accordingly, plaintiffs and defendants will be directed to submit proposals for regulation of the use of informants, and for adequate staffing and placement of the Special Needs Unit so as to ensure the abuses outlined in the Court's Findings of Fact do not reoccur in the future.

An appropriate order will be entered this day.

### Appendix I

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

| | | |
|---|---|---|
| JERALD L. KENDRICK, et al., | ) | |
| Plaintiffs | ) | CIVIL ACTION NO. 76–0079–P |
| v. | ) | CONSOLIDATED WITH 79–0092–P 79–0001–L |
| DAVID H. BLAND, et al., | ) | |
| Defendants | ) | |

| | |
|---|---|
| JAMES M. THOMPSON, et al., | ) |
| Plaintiffs | ) |
| v. | ) |
| DAVID H. BLAND, et al., | ) |
| Defendants | ) |
| UNITED STATES OF AMERICA | ) |
| Amicus Curiae | ) |

### CONSENT DECREE

By agreement of the parties and the United States of America, Amicus Curiae, the following Consent Decree is approved by the Court to resolve the issues being litigated in Civil Action No. 76–0079–P and those cases consolidated therein by the Court.

### 1. GENERAL PROVISIONS

Without admitting that the defendants have violated any constitutional rights of the plaintiffs, the defendants and plaintiffs submit the following agreement to address the issues raised in the above-styled cases:

A. The defendants shall within six months from the date of entry of this Decree submit to this Court a written report setting forth any timetables not included in this Decree to fully implement the proposals made in this Decree.

B. Plaintiffs and *Amicus* shall have sixty (60) days to object to the plan referenced in paragraph A above.

C. For any plans proposed in this Decree, the parties shall make a reasonable effort to resolve any issues in controversy through negotiation and if the parties are unable to resolve the controversy through this process, the Court shall conduct a hearing on these issues. In any event, all plans shall be submitted to the Court for approval and incorporation into the Decree.

D. The Court shall retain jurisdiction in this case until the plan submitted to the Court is fully implemented.

E. Counsel for plaintiffs and *Amicus* shall have access to records related to implementation of this Decree at reasonable times. Counsel for plaintiffs shall have access to their clients at reasonable times and under reasonable circumstances.

F. Defendants shall immediately explain the terms of this Decree to all of their agents, servants, representatives, and employees, including institutional staff, guards and other personnel, in order to assure their understanding of the requirements of this Decree and the necessity for strict compliance therewith.

G. Within ten (10) days of the date of this Decree, defendants shall provide notice to the class (a) by providing a copy of this Decree to each plaintiff class member; (b) by posting copies of this Decree in all housing units; and (c) by making ten copies of this Decree available in all institutional libraries.

H. Members of the plaintiff class shall have the right to individually submit written objections to the Court within forty (40) days of entry of this Decree.

I. By entering into this Decree, plaintiffs and members of the plaintiff class are not waiving any rights to pursue individual claims for declaratory, injunctive, and/or monetary relief. The only claims against defendants settled herein are claims for injunctive relief of a general nature, applicable to more than the individual circumstances of a particular plaintiff class member.

J. All programs dealing with the capital construction for Fiscal Year 1980–82 have been essentially approved by the leadership of the executive and legislative branches of government and are ultimately subject to ratification by the entire Kentucky General Assembly. The defendants believe that the politically responsible position on all capital construction and program funding should be resolved through the legislative process. However, should the programs proposed herein not be approved by the General Assembly, the defendants will secure necessary funding through appropriate legal processes.

## 2. POPULATION/HOUSING

Problems relating to population and housing will be addressed through an extensive capital construction program. In the area of population, the defendants agree to do the following:

A. The defendants agree to reduce the general population at the Kentucky State Penitentiary and Kentucky State Reformatory by a total of six hundred (600) inmates within six (6) months of the date of this Decree. The base figure for reduction of population at Kentucky State Reformatory shall be 2100. This reduction in total population of both institutions shall be accomplished by, but not be limited to the following measures: implementation of legislation eliminating the minimum security restrictions currently included in the law, the development of community based release centers, consideration for parole of individuals with detainers from other jurisdictions, re-classification, and re-evaluation of current policies concerning the issuance of parole violation warrants. The plan for implementation will include those measures found in Section 13.

B. The defendants agree that within one (1) year of the date of this Decree, and thereafter, the population in each and every housing unit at the Kentucky State Penitentiary and Kentucky State Reformatory shall be the rated capacity of both institutions, using American Correctional Association standards for dormitories at the Kentucky State Reformatory, single cells for other housing areas at the Kentucky State Reformatory and single cells for the Kentucky State Penitentiary. As of such date, no open dormitory at Kentucky State Reformatory shall contain double bunks. Provided, however, inmates at the Kentucky State Penitentiary may voluntarily elect to double cell.

C. For purposes of determining the rated capacity of the Kentucky State Reformatory, the open wing dormitories are adequate to house 156 inmates using the American Correctional Association standard of sixty (60) square feet per inmate.

D. The defendants agree that the total population confined at the Kentucky State Penitentiary will not exceed the number of cells available and habitable at any time on or after January 1, 1983.

E. The defendants agree that any new construction of living areas pursuant to this

proposal will comply with American Correctional Association standards and that any renovation of living areas pursuant to this proposal will comply with such standards where structurally practical.

The Bureau does not have written short-term or long-term maintenance programs for either the Kentucky State Penitentiary or Kentucky State Reformatory. However, repairs which can be accomplished by institutional staff and inmate work crews will be completed on a regular basis. This includes electrical problems, plumbing problems, and general repairs. The Bureau shall submit to the Court a comprehensive written short-term and long-term maintenance program within six (6) months of entry of this Decree. This program shall be designed to bring all living units into compliance with plumbing, electrical, ventilation, heating and other applicable state codes, except for conditions that can be corrected only through complete renovation.

In addition to maintenance programs, the Bureau shall submit to the Court a written plan addressing the areas of sanitation and pest control within three (3) months of entry of this decree.

In the area of fire safety, all major fire and safety deficiencies have been addressed in the capital construction budget included in this proposal. Fire safety training and evacuation programs will be implemented as soon as possible but not later than three (3) months from entry of this Decree.

The Bureau's proposed capital construction and housing program is enclosed as "Attachment A", and incorporated herein by reference.

As an interim measure, the Bureau will, within thirty (30) days of entry of this Decree, bring the cell houses at the Penitentiary and the dormitories and cell blocks at the Reformatory into compliance with the regulations promulgated under the Kentucky Confinement Facilities Act, whenever possible, with special attention to ventilation, temperature, lighting, and sanitation. These interim measures are necessary to alleviate the effects of the current living conditions in the two facilities during the summer months of 1980, and during the subsequent period until the Bureau's capital construction program and maintenance program alleviate these conditions permanently.

## 3. CLASSIFICATION

The defendants agree to bring the classification system into full compliance with American Correctional Association standards within nine (9) months. The defendants agree to provide a written handbook of institutional rules to all current and future inmates in the Admission and Assessment Center, the Kentucky State Reformatory, and the Kentucky State Penitentiary within three (3) months of entry of this Decree. The defendants agree to fully implement the Progressive Incarceration Plan forms within sixty (60) days of this Decree, and to review each inmate's plan every six (6) months thereafter.

Further, defendants agree to have the current classification system evaluated by the National Institute of Corrections. The evaluation will be submitted to the parties for review within three (3) months of entry of this Decree.

## 4. PROGRAMS

The Bureau of Corrections will offer substantial programs to inmates through proper and appropriate classification which will aid an inmate in his rehabilitation and prepare him for release from confinement. Defendants agree to evaluate inmate programs to consider expansion of professionally staffed programs to meet the needs of the inmates. The programs currently offered will be maintained at least at their present level. These programs include, but are not limited to:

*Living Skills Program*

A program designated as the Living Skills Program operates in three segments and each segment is directed to aid an inmate in dealing with his status as he progresses through the penal system. Specific persons are hired as living skills personnel to administer the segments.

The first segment, (T–1), is designed to help the inmate develop certain skills to function within the institution, specifically communication, decision making, and planning skills. The first segment is initiated in the Admissions and Orientation Unit at the Kentucky State Reformatory.

The second segment, (T–2), provides training for the development of daily survival skills. The inmate is advised on budgeting, family planning, health and hygiene, consumerism and banking.

The third segment, (T–3), is an attempt to prepare the inmate for his transition from confinement, such as the inmate's employability and methods for getting, keeping, and terminating employment, as well as upgrading employment once employment is obtained.

This Living Skills Program functions at both institutions.

*Education*

The academic program at both institutions includes specifically:

1) Title I—Education Program—jointly funded by federal and state agencies which provide an education program for the disadvantaged individuals under the age of 21 with learning problems and learning disabilities

2) Title—IV A—Library Program with joint funding from federal and state agencies which provide a professional librarian at each institution; funding for institution library publications; an inter-library loan program so that any book desired by an inmate is available usually within one week after request is made; and a Bookmobile Service at LaGrange.

3) Programs of individualized instruction designed and marketed by Pace Learning Systems, Inc. with an audiovisual approach for the education of adults from 0–8th grade level.

4) Grades 8–12 educational program and GED (high school equivalency) testing program.

5) Night school—Basic Adult Educational Programs

6) Two year college level program which permits the accumulation of hours for the acquisition of an Associates Degree or toward the acquisition of a Bachelor's Degree.

The defendants agree to establish a college level program which leads to the acquisition of a Bachelor's Degree.

No inmates shall be disqualified from an academic program, except for disruptive behavior in class or for violation of institutional rules such that an inmate becomes unable to attend class for more than thirty (30) days.

The defendants agree to provide access to the main library at each institution one day during the weekend in addition to the regular weekly hours. Defendants agree to supplement the main library at each institution according to the recommendations of the institution librarians within six (6) months after the entry of this Decree.

*Vocational Programs*

The Bureau provides vocational programs at both institutions. These programs function separately from the Bureau of Corrections and operate under the direction of the State Department of Education.

The vocational programs include specifically:

*LaGrange*
 Auto Body
 Auto Mechanics
 Carpentry
 Drafting
 Industrial Electricity
 Masonry
 Plumbing (to be implemented later)
 Printing
 Radio and T.V. Repair
 Small Engine Repair
 Upholstry
 Welding
*Eddyville*
 Plumbing
 Masonry
 Auto Body
 Small Engine Repair

Air Conditioning

Welding

Defendants agree to maintain functioning courses at full student capacity.

*Jobs*

All inmates shall be eligible for employment except those inmates disqualified by reason of a disciplinary action, classification or a voluntary election not to work. No inmate shall be discriminated against in the provision of a job by reason of race or religion. No inmate shall be required to take employment where such employment would be contrary to established religious tenets.

Defendants agree to provide meaningful employment. Jobs shall be genuine; no more inmates should be assigned a task than necessary. Jobs shall afford prisoners an opportunity to learn job skills and develop good work habits and attitudes that they can apply to jobs after they are released.

*Self-Help Programs*

Each institution permits inmate participation in various self-help programs, such as the Jaycees, Alcoholics Anonymous, the Emancipation Program, SPADE and others. Membership in these programs is subject to membership approval upon application by the inmate.

5. FOOD SERVICE

With respect to this Decree, defendants will undertake improvements in several areas. The cycle menu will be modified to include more information which is not reflected on the present menus. This will include listing quantities of food items served, reference to recipe cards, listing fortified beverages currently served but not listed, and the addition of new food items to the menu. Defendants agree to provide vegetable and fruit items on a daily basis. Also, controls will be placed upon substitutions on the master menu. The Bureau also will employ a nutritionist at each institution, in addition to present personnel, to coordinate such areas as staff and inmate training in food preparation, sanitation, supervision of special diets, and the develop-

ment of record keeping programs for the institutions. The nutritionist shall have a Bachelor's Degree or membership in the American Dietetic Association; institutional experience will be considered in the hiring process.

In addition, within ninety (90) days of entry of this Decree, defendants will develop a plan which sets forth food service operating procedures, including, but not limited to, procedures concerning staff and inmate training in food preparation, sanitation, food storage, supervision of special diets, record keeping, other environmental health concerns in the food service area (e.g., adequate ventilation for the food service facility and the prevention of food/dining room contamination by dripping and/or leaking water or sewage effluent), and the proper feeding of inmates in all satellite feeding operations at both institutions. Such plan shall also consider pay increases for all prisoners employed in the kitchen.

The Bureau has ordered heated food carts for satellite feeding at the Kentucky State Reformatory, has implemented a program to feed protective custody inmates at the Kentucky State Penitentiary in the dining room and has implemented the use of insulated containers to maintain food temperature for feeding inmates in Cell House 3 at the Penitentiary. Measures to eliminate the disposal of wet garbage are being addressed in capital construction projects for both the Penitentiary and Reformatory which will renovate the dining facilities at both institutions.

Custodial staff in food service areas shall engage only in security functions and shall not interfere with food service except as necessary for security.

Within thirty (30) days of entry of this Decree, defendants shall increase the feeding time for meals at the Kentucky State Reformatory to eliminate outside waiting lines.

6. DUE PROCESS

A. With respect to disciplinary procedures leading to confinement in punitive

segregation, administrative segregation, or the administrative control unit, the following procedures must be followed:

1) A copy of the incident report, and a notice of the charges, shall be given to the prisoner at least twenty-four (24) hours prior to a hearing on the matter unless such notice is waived. At the same time the copy of the disciplinary report is given to the inmate, the inmate shall be advised of his right to consult with inmate counsel of his choice at least twenty-four hours prior to the hearing. In addition, the inmate shall be advised of his right to waive the hearing and plead guilty to the charges.

2) Until the hearing, every inmate is entitled to remain in his existing status, unless he constitutes a threat to other prisoners, staff members, or himself, which requires pre-hearing detention. If pre-hearing detention is to be ordered by the shift supervisor, such order must be in writing with reasons in support thereof and reviewed and signed by the warden within twenty-four hours. Failure to do so shall return the inmate to his previous status. Any time spent in pre-hearing detention shall be credited against subsequent sentence imposed.

3) All hearings on disciplinary charges shall be heard by the Adjustment Committee, composed of an impartial panel, at least one member of which shall be non-custody personnel. The hearings shall be tape recorded. (Any panel member shall be disqualified in every case in which he/she has filed the complaint or witnessed the incident, he/she has participated as an investigating officer, he/she is the person charged with the subsequent review of the decision, or he/she has any personal interest in the outcome.) At the hearing, the inmate shall be entitled to the following:

(a) Opportunity to be present during all phases of the hearing except the deliberations phase;

(b) Representation by chosen inmate counsel who has had legal aide training and who has been allowed to confer with the inmate at least twenty-four (24) hours in advance;

(c) Only copies of written information which the Adjustment Committee has provided to the inmate at least twenty-four hours before the hearing may be considered, unless the provision of such documents would be hazardous to institutional safety;

(d) An opportunity to make a statement and to present documentary evidence;

(e) An opportunity to call witnesses on his behalf, unless doing so would be unduly hazardous to institutional safety, such reasons for denial to be stated in writing;

(f) An opportunity to confront and cross-examine his accuser and all adverse witnesses, unless doing so would be unduly hazardous to institutional safety.

4) At the conclusion of the hearing, the Adjustment Committee shall preserve the tape record and prepare a written record, which shall include (a) the Committee's decision, (b) the sentence imposed and the criteria used for imposing the particular sentence, (c) a summary of the evidence upon which the decision and sentence were based, (d) a list of all witnesses, (e) a statement as to whether the sentence may be stayed during an appeal and the reasons for that decision, (f) the date and time of the hearing, and (g) the signatures of all Committee members. A copy of this record shall be given to the inmate.

5) If the Adjustment Committee finds the inmate not guilty of the charges, or if an appeal results in the reversal of a finding of guilty, reference to the offense shall be removed from his file.

6) Defendants' current appellate procedures concerning disciplinary charges shall be amended to require the Superintendent to respond in writing, with reasons stated for the decision, within twenty days of the Adjustment Committee action on those decisions which are appealed.

B. Inmates transferred to the Kentucky State Reformatory or Kentucky State Penitentiary shall not be confined initially in segregation, administrative segregation, or the administrative control unit unless classified or disciplined to a segregation unit in accordance with the foregoing procedures.

## 7. SEGREGATION

Defendants agree to submit a plan within six (6) months which will address all special types of restricted confinement at both institutions. Those types of restricted confinement include 1) punitive segregation; 2) administrative segregation; 3) administrative control; and 4) protective custody.

The formulation of the plan will be based on an evaluation conducted by the Bureau of Corrections in light of the American Correctional Association and other comparable standards. In addition, the review and plan will give special consideration to the following issues:

1) The minimum and maximum length of confinement for any inmate in each type of confinement;

2) The criteria to be utilized by the appropriate institutional body, such as the Adjustment Committee and the Classification Committee, for sentencing and placement in any type of restricted confinement;

3) The frequency and character of the review of the status of each person confined in restrictive confinement;

4) The criteria to be utilized by the appropriate institutional body, such as the Adjustment Committee or Classification Committee, in determining the continued need for confinement of inmates in restricted confinement; and

5) Whether such criteria utilized shall be in writing.

In addition, the Bureau will also evaluate the total physical conditions of those areas of restricted confinement and the programs offered inmates placed in restricted confinement. Accordingly, the defendants will conduct this review in light of American Correctional Association standards and other comparable standards. A plan will be submitted in six (6) months in conjunction with the above stated plan addressing the following issues:

1) Length of confinement within a cell;

2) Environmental factors, such as lighting (including natural lighting) ventilation, temperature, and hot and cold running water;

3) Food service;

4) Programs such as education, recreation, access to the law and regular library, visitation, and correspondence;

5) Medical care and mental health care; and

6) Social interaction.

The defendants agree to submit a plan within one year which addresses the entire area of providing protective custody to inmates. This plan will consider the removal of the Protective Custody Unit from the Kentucky State Penitentiary and its relocation to another institution. This plan will set forth a complete program for protective custody including location or locations and programs including academic, counselling, recreation, and all other programs available to the general population. Currently certain academic, recreational, and other programs are made available to those inmates confined in the Protective Custody Unit at the Kentucky State Penitentiary separate from the general population. In particular, 1) evening adult education classes are conducted three evenings a week; 2) recreation programs are available two evenings per week in the gymnasium; 3) recreation equipment is available in each area of Protective Custody; and 4) self-help programs are open to Protective Custody inmates on alternate weeks. The defendants agree to house one man per cell in any Protective Custody Unit within six (6) months of entry of this Decree.

Defendants agree that the noon count at the Kentucky State Penitentiary will be discontinued by May 1, 1980.

Defendants agree that on July 1, 1980, when 40-hour physician coverage per week is available at the Kentucky State Peniten-

tiary, sick call will be conducted twice a week by a physician in the Segregation Unit at the Kentucky State Penitentiary. Defendants will by such date also provide for visits by a staff physician twice a week to the segregation areas at the Kentucky State Reformatory.

Defendants further agree that a physician will periodically review the sick call screening conducted by medical aides at both institutions—at a minimum, this review will be conducted once a month.

The defendants agree to submit a total recreational plan for all segregated housing units within six (6) months of entry of this Decree.

## 8. ACCESS TO THE COURTS

Defendants agree to implement a plan for maintaining and operating the law library at both institutions upon the advice and recommendations of the respective librarians at each institution and the respective member of the Office for Public Advocacy with the advice and consultation of a competent law librarian within three (3) months. At a minimum, the defendants agree to provide the following:

*Federal Materials*

1) West's Supreme Court Reports, or Lawyer's Edition, 1960 and forward;
2) Federal Second Reporter, 1960 and forward;
3) Federal Supplement Reports, 1960 and forward;
4) United States Code Annotated, West Publishing Company:
 (a) Index volumes
 (b) Constitution of the United States volumes
 (c) Title 18 volumes
 (d) Title 28 volumes
 (e) Title 42 volumes
5) Federal Practice Digest, Second Series;
6) Paperback edition—Federal Rules of Civil Procedure, Evidence, Appellate Procedure and Title 28, West Publishing Company;

7) Paperback edition—Federal Rules of Criminal Procedure, Evidence, Appellate Procedure and Title 18, West Publishing Company;
8) Shepard's United States Citations;
9) Shepard's Federal Second and Federal Supplement Citations.

*Kentucky Materials*

1) Kentucky Revised Statutes;
2) Kentucky Digest, West Publishing Company;
3) Southwestern Report, 2d Series, Kentucky cases, entire series, for the years preceding the publication of S.W.2d, either Southwestern Reporter of the official reports of the Kentucky Court of Appeals;
4) Shepard's Kentucky or Southwestern Reporter Citations.

*Miscellaneous Publications*

1) Corpus Juris Secundum:
 (a) Habeas Corpus volumes
 (b) Appeal and Error volumes
 (c) Constitutional Law volumes.
* 2) Black's Law Dictionary;
* 3) Cohen, *Legal Research in Nutshell*;
4) Criminal Law Reporter;
* 5) Israel, *Criminal Procedure in a Nutshell*;
* 6) Murrell, *Kentucky Criminal Law*;
7) Sokol, *Federal Habeas Corpus*;
8) Prison Law Monitor;
9) Wright, *Federal Courts*;
* 10) Potts, *Prisoners Self-Help Litigation Manual*;
* 11) ACLU Handbook, *The Rights of Prisoners*;
* 12) Bronstein, Hirschkop, *Prisoners' Rights*, 1979.

* Each of the books by which there is an asterisk shall be furnished in at least three (3) copies.

Defendants agree that all volumes will be kept up to date according to the publishers' revisions. In addition, the plan shall include provision for expansion of the law library facilities sufficient to meet the needs of the prisoners.

In cooperation with the Office for Public Advocacy, defendants will hire within four

(4) months of the entry of this Decree, three more assistant public advocates, four (civilian) paralegal assistants, and two senior clerk typists to be distributed between the Penitentiary and the Reformatory. The Office for Public Advocacy will continue to serve in a resource capacity for the Bureau and for prisoners when the subject matter goes beyond post-conviction relief.

Inmate legal aides shall be chosen on the basis of an open competitive written and oral examination designed to test legal aides. Inmate legal aides will continue to be given a two-week training program established by the Office for Public Advocacy. The instructors for this program are confined to attorneys, judges, and clerks throughout the Commonwealth. The training program for legal aides totals 80 classroom hours. The first week of instruction involves a survey and review of:

Criminal Law & Procedure

Civil Procedure

Domestic Law

History and Evolution of the Law

Appellate Courts and Procedure

Federal Courts

Preparation of Federal Habeas Corpus Petitions

Administrative Law with emphasis on parole and probation revocation and disciplinary hearings

Post Conviction Remedies

The second week consists of instruction in legal research and writing which culminates in a moot court type practice session.

Defendants agree to develop with the Office for Public Advocacy a plan within six (6) months for continuing legal education of legal aides.

Defendants agree that any prisoner capable of assisting other prisoners in the preparation of legal papers or in the prosecution of a lawsuit may do so without fear of disciplinary action, provided that the particular prisoner has been appointed or is seeking appointment by a court to so assist another prisoner. In the alternative, defendants will not oppose the entry of a Decree by this Court permitting the appointment of any prisoner to assist another prisoner, in the defense cr prosecution of legal proceedings upon a showing that such prisoner is capable of rendering such assistance. Defendants further agree that neither inmate legal aides nor appointed inmate legal assistants will be removed from their jobs or receive any other disciplinary action for filing any legal action against defendants, their agents, or their employees.

### 9. INMATE MAIL

Plaintiffs and defendants agree that any violation of the plaintiffs' right to send or receive mail shall be resolved in separate proceedings under *Preston v. Cowan*, 369 F.Supp. 14 (W.D.Ky.1973), and supplemental proceedings therein, Civil Action No. 2381–P(J) (March 26, 1979).

### 10. RECREATION AND EXERCISE

The Bureau of Corrections will submit to the Court within three (3) months of entry of this Decree a written recreation and exercise program which reflects currently operating programs and possible modification of those programs to include additional activities, particularly hobbies and other leisure time activities. The program shall be designed to meet the needs of the prison population. This plan shall include, but is not limited to, utilization of all dayrooms exclusively for the recreation of the residents of the housing unit in which the dayroom is located. The current recreation program will be maintained at least at the current levels. It consists of the following programs:

Kentucky State Penitentiary

General Population

Outdoor weight lifting equipment
Handball court
Swimming pool
Gymnasium for basketball
 boxing
 volley ball
Shop #1 for T.V. viewing
 Board games
 Billiards

Special Needs Area - Cellhouse #3

Ping pong
Television viewing

Special Needs Area - Cellhouse # 3

Reading
Fitness exercise - 2 evenings per week outside cell

Administrative Custody - Cellhouse # 3

Board games
Reading
Exercise outside cell 1 hour per day

Protective Custody

Programs described earlier in this document.

Death Row

Weight lifting
T.V. viewing
Reading
Board games
Ping pong
Softball equipment

Kentucky State Reformatory

General Population

Tennis
Handball
Softball
Touch football
Gymnasium for basketball
boxing
weight lifting
jogging
billiards
ping pong
Board games
T.V. viewing
Weekly movies
Intramural program
Horseshoe
Fitness program

Geriatrics

Board games
Movies
T.V. viewing
Croquet
Horseshoe

Protective Custody Unit (Short-term)

Exercise outside cell daily
Board games

Admissions and Orientation

T.V. viewing
Movies
Gymnasium: weight lifting
billiards
ping pong
basketball
Board games - (weekends only)
Horseshoe
Volley ball

Special Needs

Gymnasium twice a week - 1 hour
basketball
volley ball

Special Needs

billiards
ping pong
weight lifting
Movies
Board games
Gardening

Defendants agree that upon completion of the new 200-man unit at the Kentucky State Penitentiary in January, 1983, Cellhouses 1 and 2 will no longer serve as housing units for inmates at the Kentucky State Penitentiary. Cellhouses 1 and 2 will be renovated and utilized for inmate programs, some indoor recreation and some administrative functions. Defendants further agree that funds in the amount of $25,000 have been requested and committed for the repair of the gymnasium roof at the Kentucky State Penitentiary in the first year of the biennium.

Defendants agree to provide a fenced area near Cellhouse 3 within three (3) months so that outdoor exercise will be available to inmates housed in Cellhouse 3 on a scheduled basis. Plans concerning the provisions for outside exercise for Cellhouse 3 will be submitted within six (6) months as part of the overall plan pertaining to the segregated housing units explained above.

11. RELIGION

The defendants agree to make the chapel available to all religious faiths and to permit religious groups to receive religious literature provided that the literature does not threaten the security of the institution. The defendants agree to serve one pork free meal per day and to notify the residents of any pork or pork derivative item on all menus. In addition, during the month of October each year, defendants agree to serve two (2) pork free meals per day. The defendants agree to allow all faiths to collect donations for religious purposes on the same basis provided the religious group abides by the institutional rules for collecting donations. The defendants agree to prohibit harassment of any religious group or faith. The issues concerning free exercise of religion by Muslim inmates at the Kentucky State Reformatory shall be litigated separate from this Decree.

## 12. VISITATION

The Bureau of Corrections encourages and agrees to maintain visitation at least at the current level with minimal restrictions. Any searches of inmates conducted by the Bureau of Corrections shall be conducted in a reasonable manner in compliance with minimal constitutional standards and shall not be conducted in an abusive manner. All searches of female visitors shall be conducted by a female staff member.

Defendants will build a new visitation building at Kentucky State Reformatory which shall, at a minimum, permit informal private communication and opportunity for physical contact. Within three (3) months of entry of this Decree, defendants shall submit a plan to expand and improve present visiting facilities at the Kentucky State Reformatory. After completion of the new 200-man housing unit at Kentucky State Penitentiary, Cellhouses 1 and 2 will be completely gutted and used for program areas such as visitation.

Defendants shall continue their open visiting policy at Kentucky State Reformatory. Defendants agree to employ two (2) prisoners per housing unit at Kentucky State Reformatory as "runners" whose function shall be to inform prisoners that their visitors have arrived.

Defendants agree to set up a telephone bank for Kentucky State Reformatory similar to the one at Kentucky State Penitentiary.

## 13. PAROLE

The defendants will provide any inmate who is denied parole or is given a deferment written reasons for such denial or deferment.

In order to assist prisoners seeking parole, the defendants agree to make telephone directories of Kentucky and newspapers from different geographic areas available to prisoners in the library in order to assist the prisoners in finding job and home placements. The defendants further agree to inform every prisoner on parole the proper procedure for restoration of his civil rights.

In conjunction with the provisions on population reduction in this Decree, defendants agree to implement a plan, as soon as possible within six (6) months of entry of this Decree, to address at least the following:

(a) Written rules which will provide strict standards for the issuance of parole violation warrants;

(b) Diversion of technical parole violators to community treatment centers;

(c) Establishment of halfway houses and pre-release centers for prisoners awaiting parole;

(d) Objective criteria for furloughs and pre-release programs.

## 14. GRIEVANCES

The Bureau has implemented a grievance procedure for the Kentucky State Penitentiary and Kentucky State Reformatory. A copy of that program will be submitted to the Court by June 1, 1980, for review. Such plan will include reasonable time standards at every stage of the grievance procedure. Such time standards shall be followed strictly. Failure to meet such time standards shall result in favorable action on the grievance.

## 15. CASEWORKER SERVICES

The Bureau of Corrections shall build a caseworker building at the Kentucky State Reformatory as proposed in its capital construction budget. Caseworker staff increases are addressed in the staff section.

All classification and treatment officers shall meet the requirements of their job description. This provision shall not apply to present classification and treatment officers.

## 16. STAFF

The training program for institutional staff is designed by the Bureau of Training at Richmond, Kentucky. Such program ranges from a minimum of a basic orientation program to a two week (40 hour per week) in-depth academy training for custo-

dy personnel. Forty hours specialized training is provided at the Academy for certain custody personnel and a minimum of forty hours on the job training for all staff is mandatory. This program will be maintained at least at its current level. On-the-job training within the institution shall not be inconsistent with the Academy training.

Defendants will provide and implement a comprehensive recruitment plan and personnel plan for each institution within twelve (12) months. This plan shall include, but is not limited to, affirmative recruitment of minorities and women. The Bureau of Corrections has requested in the 1980–82 budget proposal an increase in staff positions and staff salary including a specific proposal for twenty percent (20%) salary increase for correctional officers in the amount of $4,223,658. This will provide the basis for the comprehensive recruitment and personnel plan referred to above. This salary increase shall be implemented for all correctional officers when funds are made available for this purpose on a priority basis by the Department of Personnel.

Staff requests made by the Bureau in current budget requests are: (This does not include requests for the Luther Luckett Complex.)

*Kentucky State Reformatory*

Custody:
 6 Sr. Clerk Typists
 1 Sr. Clerk Steno
Inmate Support:
 2 Operating Engineers
 1 Carpenter Foreman
 1 Paint Foreman
 2 Plumber Foremen
 2 Electrical Supervisors
 4 Pharmacy Assistants
 4 Medical Aide II
 1 Clerk Typist—Visual Care Center
 1 Dietitian II
Career Development:
 5 Clerk Typists
 3 Clerks
 1 Psychologist II

*Kentucky State Penitentiary*

Medical and Dietary Services:
 3 Principal Chefs
 1 Senior Nutritionist
 1 Senior Dental Hygienist
Bureau-wide requests which affect the Kentucky State Reformatory and Kentucky State Penitentiary:
 11 new positions for OJT programs including vocational teachers and typists
 16 new positions for centralized inmate recreation program.

The engineers and electrical supervisors shall meet the qualifications of their job descriptions and the senior plumber shall be licensed.

With respect to plaintiffs' allegations of harassment and brutality by correctional officers at the Kentucky State Penitentiary, the parties have been unable to agree on a mutually satisfactory permanent resolution of this issue. As a result, this issue must be fully litigated and *is not, therefore, included in this Agreed Consent Decree.* The standards of behavior ultimately established shall be applicable at the Kentucky State Reformatory.

At the Kentucky State Reformatory, the defendants will not reduce the current level of correctional officer positions.

At the Kentucky State Reformatory, the defendants will provide a minimum of one (1) guard per floor in each open dormitory and one (1) roving supervisor per unit per shift. Except in emergency situations, the correctional officer will remain in the dormitories.

17. MEDICAL AND MENTAL HEALTH SERVICES

The Bureau of Corrections provides medical and mental health programs at both the Kentucky State Penitentiary and the Kentucky State Reformatory. Defendants acknowledge that medical care is a prisoner's right and not a privilege. Defendants shall submit a plan within three (3) months for review by the parties to assure immediate attention to emergency medical cases, in-

cluding, but not limited to, staff training in such procedures. Such plan shall meet American Correctional Association standards for emergency medical care.

With the completion of the Luther Luckett Correctional Complex, which includes a forensic psychiatric hospital, the Bureau will offer a more comprehensive mental health care program for inmates. With the opening of the Luther Luckett Correctional Complex, the Special Needs Unit at the Kentucky State Penitentiary will be closed. All acute care psychiatric prisoner patients will be housed in the new forensic hospital. That facility is scheduled to open on October 1, 1980, with a gradual phase in of inmates. Defendants further agree to develop a plan for providing services to prisoners with non-acute psychiatric and psychological problems within six (6) months of the entry of this Decree.

Both facilities will have forty (40) hours per week physician coverage and twenty-four (24) hour per day telephone coverage by a licensed physician by July 1, 1980.. The Bureau has sufficient positions to provide twenty-four (24) hour per day registered nurse coverage at both institutions. Within ninety (90) days from the entry of this Decree, defendants will provide twenty-four (24) hour per day registered nursing coverage.

Within ninety (90) days from the entry of this Decree, defendants will make adequate provision for dental emergencies and regular dental health maintenance.

Effective upon the entry of this Decree, defendants will guarantee that the services and treatment prescribed by defendants' consulting outside physicians and health personnel are fully provided as prescribed.

Prisoners will be allowed to grow beards for medical reasons upon the direction of a medical doctor.

## 18. RACIAL DISCRIMINATION

The defendants agree to not discriminate against any inmate on the basis of race, religion, or creed and to develop educational curricula addressing minority cultures which are designed to eliminate the effects of cultural disparities amongst prisoners and staff.

## 19. PRISON INDUSTRIES

Defendants agree to request that a survey of prison industries be conducted pursuant to the provisions of KRS 338.041 within six (6) months of entry of this Decree. The Bureau will implement these recommendations as soon as is practical after the survey is completed.

## 20. COMMISSARY

The Board of Directors of the Bureau of Corrections Canteen operation will review pricing practices in the commissaries to determine if prices may be reduced. Inmates may make written recommendations to the Board setting forth any proposals which they wish the Board to consider. The Board will issue a report setting forth its recommendations. The commissaries will sell fresh fruit on an experimental basis for three (3) months to assess its economic practicability.

## 21. PERSONAL SUPPLIES

The defendants will provide the prisoners without charge the following items: adequate and suitable clothing, toothbrushes, toothpaste, razor, razor blades, soap (including hypo-allergenic soap as medically necessary), toilet paper, shaving cream, magic shave and matches. The defendants agree to provide a clean mattress and pillow which meet federal fire safety standards; at least two clean sheets, pillow cases, and at least two towels weekly; and a clean blanket every six (6) months. The defendants agree to provide a metal mirror for each lavatory at the Kentucky State Penitentiary and three mirrors per toilet area at the Kentucky State Reformatory. Within sixty (60) days of entry of this decree, every inmate at the Kentucky State Reformatory will have a pillow.

## 22. PHYSICAL DISABILITIES

The defendants agree to conduct a study in cooperation with the Kentucky Depart-

ment of Finance concerning the physical barriers to the handicapped at its institutions in compliance with the Rehabilitation Act of 1973. The defendants agree to submit this study and plan for correcting any deficiency within six (6) months of the entry of this Decree.

### 23. ENVIRONMENTAL AND HEALTH INSPECTOR

The Bureau will employ an environmental and health inspector who will periodically evaluate and insure the Bureau's compliance with appropriate state codes.

### 24. TIMETABLES

Any timetable proposed in this Consent Decree would be subject to extensions by the Court upon a showing of reasonable grounds for such extension by the defendants. The Court recognizes, however, that lack of funding does not constitute reasonable grounds for failure to enforce constitutional rights.

### 25. PLAINTIFF COOPERATION

Members of the plaintiff class would be enjoined individually or as a group from any acts which would result in non-compliance with any terms of this consent decree

through no fault of the defendants. Members of the plaintiff class would be required to assist the defendants in repairing and maintaining public property in the best condition possible by not damaging or destroying public property in the institutions.

### 26. SUPPLEMENTAL RELIEF

Upon any motion for Supplemental Relief pertaining to this Decree, that Motion shall take priority and the Court will hear said Motion no later than thirty (30) days after the filing of such Motion and the Court will rule on such Motion no later than forty-five (45) days from completion of the hearing. Provided further that such time limit may be extended by the Court in order to substantially further the interests of the parties.

### 27. ATTORNEYS' FEES AND COSTS

Defendants agree to pay plaintiffs' counsel reasonable attorneys' fees and costs to be agreed to by the parties or determined by the Court.

This Consent Decree has been approved by the Court with the provision that the Court has reserved the power to modify the Decree after any objections to the Decree have been filed and properly reviewed by the Court.

HAVE SEEN

*AGREE TO CONSENT DECREE:*

/s/ Leslie W. Abramson
LESLIE W. ABRAMSON
University of Louisville
School of Law
Louisville, Kentucky

/s/ Joseph S. Elder, II
JOSEPH S. ELDER, II

/s/ Lloyd C. Anderson
LLOYD C. ANDERSON

/s/ Alan L. Schmitt
ALAN L. SCHMITT
Legal Aid Society, Inc.
425 West Muhammad Ali Boulevard
Louisville, Kentucky 40202
Telephone: (502) 584-1254

COUNSEL FOR LAGRANGE PLAINTIFFS

/s/ Oliver H. Barber, Jr.
OLIVER H. BARBER, JR.
800 Marion E. Taylor Building
Louisville, Kentucky 40202

/s/ Richard H. Burr, III
RICHARD H. BURR, III
P. O. Box 120636-Acklen Station
Nashville, Tennessee 37212

COUNSEL FOR EDDYVILLE PLAINTIFFS

/s/ J. M. Baker
 JAMES M. BAKER

/s/ Paul F. Isaacs
 PAUL F. ISAACS
 Office of General Counsel
 Department of Justice
 State Office Building
 Frankfort, Kentucky 40601
 Telephone: (502) 564–7554

/s/ Barbara H. Willett
 BARBARA H. WILLETT
 Office of Attorney General
 Special Prosecutors Division
 209 St. Clair Street
 Frankfort, Kentucky 40601
 Telephone: (502) 564–2348

 COUNSEL FOR DEFENDANTS

/s/ Albert Jones
 ALBERT JONES
 UNITED STATES ATTORNEY

/s/ Hancy Jones, III
 HANCY JONES, III
 ASSISTANT UNITED STATES ATTORNEY

/s/ Shawn Moore
 SHAWN MOORE

/s/ Adjoa Burrow
 ADJOA BURROW
 United States Department of Justice
 Civil Rights Division
 Washington, D.C. 20530

 AMICUS CURIAE

HAVE SEEN AND AGREE:

/s/ Guy Appleton
 GUY APPLETON

/s/ John Bennett
 JOHN BENNETT

/s/ Roy E. Cline
 ROY CLINE

/s/ James Fultz
 JAMES FULTZ

/s/ Clifford Ray Hall
 CLIFFORD HALL

/s/ Jimmie Luna
 JIMMIE LUNA

/s/ Donald Moore
 DONALD MOORE

/s/ Jimmy Quinn
 JIMMY QUINN

/s/ John Reneer
 JOHN RENEER

/s/ Donnie Randolph
 DONNIE RANDOLPH

/s/ Lawrence Jap Smith
 LAWRENCE SMITH

/s/ Robert Eugene Smith
 ROBERT SMITH

EDDYVILLE PLAINTIFFS' COMMITTEE

HAVE SEEN CONSENT DECREE
AND APPROVED:

/s/ James M. Thompson
 JAMES THOMPSON

/s/ Walter M. Harris
 WALTER HARRIS

/s/ Wilgus Haddix
 WILGUS HADDIX

/s/ Leslie Brannum
 LESLIE BRANNUM

LAGRANGE CLASS REPRESENTATIVES

## ATTACHMENT A

### LUTHER LUCKETT CORRECTIONAL COMPLEX
(A Complete Institution With All Necessary Support Facilities)

| PROJECT | CONTRACT AWARDED | ESTIMATED COMPLETION DATE | COST |
|---|---|---|---|
| 97 Bed Forensic Hospital | September, 1978 | October 1, 1980 | $21,950,000 |
| 3 96 Bed Living Units (Pod 1, 2 & 3) | | | |
| 1 96 Bed Living Unit (4th Pod With Support Services) | May 1, 1980 | August 1, 1981 | 3,400,000 |
| 96 Bed Living Unit (5th Pod) | August 1, 1980 | November 1, 1981 | 2,815,846 |
| Vocational School | August 1, 1980 | November 1, 1981 | 1,568,000 |

### KENTUCKY STATE REFORMATORY

| PROJECT | CONTRACT AWARDED | ESTIMATED COMPLETION DATE | COST |
|---|---|---|---|
| Renovation of Dining Facilities - (Install waste disposal system, electrical improvements, fire and safety improvements, replace coolers and lockers, replace sinks, replace steam kettles, install fly and insect traps, replace floor tile, replace serving lines and grills and purchase new equipment) | September 1, 1980 | September 1, 1981 | 550,000 |
| Fire and Safety Improvements in Administration Building, Dormitories, and Hospital - (Replace doors, improve fire corridors, install fire exists, enclose fire escape from hospital, and install fire, and install smoke detector systems in all buildings) | | | |
| Renovation of Cellhouse 4 | April 1, 1980 | April 1, 1981 | 269,000 |
| Locking System, Cellhouse 5 - (A New electrical locking system will be installed in Cellhouse 5) | April 1, 1981 | July 1, 1982 | 1,200,000 |
| Sewage Disposal System - (The sewage disposal system will be expanded to provide an additional treatment stage for | July 1, 1980 | April 1, 1981 | 750,000 |

| PROJECT | CONTRACT AWARDED | ESTIMATED COMPLETION DATE | COST |
| --- | --- | --- | --- |
| sewage and to handle the disposal of wet garbage from the dining facility) | October 1, 1980 | October 1, 1981 | 200,000 |
| Electrical System - (Replacement of all wiring in the institution which does not meet fire and safety codes) | November 1, 1980 | November 1, 1981 | 1,078,500 |
| Steam Loop - (Complete renovation of the steam distribution system to the remaining areas of the institution which includes prison industries, the vocational education building, and visitation building) | November 1, 1980 | November 1, 1981 | 300,000 |
| Boiler Repair - (Renovation for maintenance purposes of the electrical boiler system) | August 1, 1980 | August 1, 1981 | 250,000 |
| Roof Repair for Gymnasium | July 1, 1980 | December 1, 1980 | 25,000 |

## FUTURE FACILITIES
### (Or Renovated Facilities)

| PROJECT | CONTRACT AWARDED | ESTIMATED COMPLETION DATE | COST |
| --- | --- | --- | --- |
| Construct or Renovate Correctional Facilities (Such facilities to be designed, constructed and/or renovated to meet the custody needs dictated by the Bureau's classification program) | July 1, 1981 | Contingent upon contracts | 25,000,000 |
| Renovation of Two Dormitories, One Each Fiscal Year. The Bureau will renovate two dormitories each subsequent biennium until all dormitories are single rooms. (Convert dormitories to single cell living quarters of 60 sq. ft. with approximately 84 cells per dormitory) | October 1, 1980 | July 1, 1982 | 2,074,000 |
| Complete Electrical System - Phase II - (Complete electrical system for remainder of institution to complete balance of project completed in 1979) | January 1, 1981 | January 1, 1982 | 812,000 |
| Construction of Visitation Building | January 1, 1981 | January, 1983 | 268,000 |
| Contruction of Caseworker Services Building - (Provide office space for caseworkers separate from the dormitories) | January, 1981 | January, 1983 | 182,000 |

## KENTUCKY STATE PENITENTIARY

| PROJECT | CONTRACT AWARDED | ESTIMATED COMPLETION DATE | COST |
| --- | --- | --- | --- |
| Renovation of Cellhouse 5 - (Complete renovation of Cellhouse 5 and dining facility. The dining area improvements will be similar to that listed for the Kentucky State Reformatory above. The living area will include single cells, new plumbing, electrical and air exchange systems, replace windows and install fire exits) | November, 1979 | April 1, 1981 | 4,195,000 |
| Construction of 200 Bed Housing Unit - (A new 200 man cellhouse will be constructed inside the perimeter of the institution to include single cells and all construction requirements recommended by the American Correctional Association) | July, 1980 | January, 1983 | 5,641,000 |

Appendix II

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

JERALD L. KENDRICK, et al.,
　　　　　　　　PLAINTIFFS,

v.　　　　　　　　　　　　　　　　　　　　CIVIL ACTION
　　　　　　　　　　　　　　　　　　　　NO. 76–0079–P

DAVID H. BLAND, et al.,
　　　　　　　　DEFENDANTS.

　　　　　　　　　　　　　　　　　　　　CONSOLIDATED WITH

JAMES M. THOMPSON, et al.,
　　　　　　　　PLAINTIFFS,

v.　　　　　　　　　　　　　　　　　　　　CIVIL ACTION
　　　　　　　　　　　　　　　　　　　　NO. 79–0092–P

DAVID H. BLAND, et al.,
　　　　　　　　DEFENDANTS.

UNITED STATES OF AMERICA,
　　　　　　　　AMICUS CURIAE.

---

## SUPPLEMENTAL PARTIAL CONSENT DECREE

By agreement of the Kendrick Plaintiff Class and the United States of America, *Amicus Curiae*, the following Consent Decree is approved by the Court to resolve, in part, the issues of harassment and brutality being litigated in Civil Action No. 76–0079–P and those cases consolidated therein by the Court. The Consent Decree filed and entered by the Court on May 28, 1980 did not address the issue of guard brutality. Specifically the Consent Decree provided:

With respect to plaintiffs' allegations of harassment and brutality by correctional officers at the Kentucky State Penitentiary, the parties have been unable to agree on a mutually satisfactory permanent resolution of this issue. As a result, this issue must be fully litigated and *is not, therefore, included in this Agreed Consent Decree.* The standards of behavior ultimately established shall be applicable at the Kentucky State Reformatory. (Emphasis added)

The philosophy under which this agreement is entered into is to protect the dignity of the individual and the security of the institution. There shall be no harassment or arbitrary treatment of an inmate or his property, nor any use of physical force, chemical or mechanical restraints, except as provided pursuant to this agreement.

Therefore this Consent Decree is now entered pursuant to the following terms:

## 1. GENERAL PROVISIONS

Without admitting that the defendants have violated any constitutional rights of the plaintiffs, the defendants and plaintiffs submit the following agreement to address some issues of harassment and brutality raised in the above-styled case:

a. The defendants shall within 90 days from the date of entry of this Decree submit to this Court written plans for the implementation of this Decree, including a report of all procedures implemented to date, and setting forth any timetables not included in this Decree to fully implement the proposals made in this Decree.

b. Plaintiffs and *Amicus* shall have 60 days to object to the plan referenced in paragraph (a) above.

c. For any plans proposed in this Decree, the parties shall make an effort to resolve

any issues in controversy through negotiation and if the parties are unable to resolve the controversy through this process, the Court shall conduct a hearing on these issues. In any event, all plans and procedures developed pursuant to this agreement shall be submitted to the parties for comment and to the Court for approval and incorporation into the Decree.

d. The Court shall retain jurisdiction in this case at least until the plans submitted to the Court are fully implemented.

e. Within ten days of the date of this Decree, defendants shall provide notice to the class providing a copy of this Decree to each plaintiff class member. Within ten days of the entry of this Decree, defendants shall post copies of this Decree in all housing units and by making ten copies of this Decree available in all institutional libraries.

f. Members of the plaintiff class shall have the right to individually submit written objections to the Court within forty (40) days of the signing of this Decree.

g. By entering into this Decree, plaintiffs and members of the plaintiff class are not waiving any rights to pursue individual claims for declaratory, injunctive, and/or monetary relief. The only claims against defendants settled herein are claims for injunctive relief of a general nature, applicable to more than the individual circumstances of a particular plaintiff class member.

h. By entering into this Decree, Amicus and plaintiffs have not waived any rights to proceed in any manner to seek further relief and/or remedies if the defendants are unable to comply with any provision of this Decree.

2. The defendants agree that the preliminary injunction entered by the United States District Court, Western District of Kentucky, on March 20, 1980, be made a permanent injunction.

3. In order to develop a competent work force, consistent with this Consent Decree, that is capable of professionally performing the numerous mental and physical demands placed on them, the Bureau of Corrections shall request that the State Department of Personnel develop a selection and monitoring process to be implemented for the hiring of non-clerical correctional personnel that includes exploration of the following:

a. The development of a psychological test for the purpose of determining fitness to work within correctional institutions. The test shall be administered upon the application by an individual for a non-clerical correctional position with the Bureau of Correction.

(1) Prior to the utilization of the psychological test, validation studies and reports on which the test is based will be provided to all counsel of record for review.

(2) The test shall be utilized only upon a showing of validation and the absence of a cultural and racial bias.

b. Within 90 days of the entry of the Decree, the development and implementation by the Bureau of Corrections personnel of general guidelines for interviews of an applicant for a non-clerical correctional position for the purpose of determining fitness to work within a correctional institution.

c. Within 90 days of the entry of the Decree, the development and implementation of a formal evaluation process of non-clerical correctional personnel's job performance, in addition to the present annual review procedure, for the purpose of determining continuing fitness to work within a correctional institution.

d. With respect to the foregoing selection and monitoring process:

(1) If an individual is determined to be unfit after completing the selection process, he/she shall not be employed by the Bureau of Corrections in an institutional setting or,

(2) If an individual is determined to be unfit after completion of any evaluation after hiring, the defendants agree to seek removal of the individual.

Pursuant to the entry of this Consent Decree the Bureau of Corrections will advise all parties within 40 days after the next scheduled personnel board meeting af-

ter entry of the Decree of the response of the State Department of Personnel to the request and recommendations of the Bureau regarding the development and implementation of the above mentioned procedures.

4. The Bureau of Corrections is currently reviewing the Training Program for Bureau of Corrections personnel, particularly General Academy Curricula. The Bureau is currently considering General Academy training to include Human Relations Education, Technical Skills, Physical Skills. In addition, the Bureau of Corrections will obtain from the Bureau of Training and implement the following:

a. A basic training course which will train and develop identification, communication, reaction and responsive skills to special offender inmates, (e.g. mentally ill, mentally retarded, emotionally disturbed) by correctional officers.

b. A supplemental training program for annual recurrent training utilizing ACA guidelines as a basis for the development of recurrent training specifically §§ 4092, 4096, 4098.

Pursuant to the entry of this Decree, the Bureau of Corrections will advise all parties, within 40 days of the entry of this Decree, of the response of the Bureau of Training.

5. The defendants agree that there shall be no use of physical force, chemical or mechanical restraints, except when the inmate poses a danger to self or others. Further, there shall be no arbitrary, unnecessary, or excessive physical intrusions of an inmate or his property, or removal of property without a receipt; nor any verbal abuse, harassment (including threats of discipline or writeups), or arbitrariness in dealing with inmates or their property, on the part of correctional personnel. The defendants agree to comply with the applicable ACA standards regarding the use of mace including Sections 4165–4171. In addition, the defendants agree to utilize the following guidelines and procedures for the use of mace, restraints, use of force, and shakedowns of inmates and inmate cells, effective upon the entry of the Consent Decree.

a. *MOVEMENT OF INMATES AND USE OF BATONS AND CHEMICAL AGENTS IN SEGREGATED AREAS*

All batons and chemical agents will be stored inside the cage in a locked box. These may only be issued upon orders of the Shift Captain or Shift Supervisor, if no Shift Captain is on duty. The only exception to acting upon orders of the Shift Captain will be in case of an emergency, such as, life threatening situation, escape, and so forth. Immediately after such emergency use, the Shift Captain will be notified. A strict and separate log will be maintained as to the issuance and use of these items.

The duty officer will be notified in advance on use of force or issuance of chemical agents and/or batons in every case.

b. *RESTRAINTS*

The defendants agree that as to all inmates that the least amount of force necessary to enforce institutional rules will be used and that mechanical restraints will not be used: as a method of punishment; to quiet a noisy inmate; about the head or neck of an inmate; in a way that causes undue physical discomfort, inflicts physical pain, or restricts the blood circulation or breathing of the inmate. The following guidelines will serve as a minimum standard by which defendants will develop their procedures for use of restraints:

(1) Restraints which, when applied, prevent a prisoner from rising from his bed, using toilet facilities, or eating shall not be used on any inmate in a locked cell except in extreme circumstances, such as when the inmate threatens suicide or experiences a violent episode of mental instability, or needs to be completely subdued for a very short period of time after behaving violently towards another person.

(2) Persons in restraints shall be monitored every fifteen (15) minutes by correctional personnel.

(3) Only under the conditions set forth above may restraints be applied, and then

for a period not longer than three (3) hours on the order of the Shift Supervisor. Any continued use of restraints beyond the three hour period must be approved by a physician, either personally or by telephone, within this three-hour period. This extension may be for no longer than three (3) additional hours. Authorization for continued use of restraints beyond an initial extension can be given only by a physician based on a personal examination of the inmate and only for reasonable periods not to exceed eight (8) hours. The inmate may not be continued in restraints beyond any authorized period without a further personal examination and authorization by a physician.

(4) The inmate should be released or placed in lesser restraints unless the physician finds that his behavior mandates otherwise.

(5) A log shall be kept noting the name of the inmate restrained, the reason for the restraint, the type of restraint used, the time of initial restraint, the time of authorization, the name of the physician, the time monitored, the name of the person monitoring, and the time of release.

c. *CONTRABAND CONTROL*

(1) Body shakedowns shall not be done arbitrarily and in all events shall be done in a manner which respects the dignity and privacy of an individual.

(2) Body strip searches shall not be done arbitrarily, before a person of the opposite sex, and in all events shall be done in a manner which respects the dignity and privacy of the inmate.

(3) Cell searches shall not be done arbitrarily; shall be done in front of the inmate when he is available; shall be conducted in a manner which respects the privacy and property of the inmate; and shall not destroy or disrupt the property of the inmate.

6. The Bureau of Corrections has in the past and will continue to utilize the process of forwarding all extraordinary occurrence reports to the Deputy Commissioner of the Bureau for review and monitoring.

7. The Bureau of Corrections shall, within 90 days after the entry of this Decree, submit a plan to all counsel of record proposing a monitoring process for the implementation of this Consent Decree.

8. This Consent Decree has been approved by the Court with the provision that the Court has reserved the power to modify the Decree after any objections to the Decree have been filed and properly reviewed by the Court.

So Ordered.

HAVE SEEN

AGREE TO CONSENT DECREE:

/s/ Paul F. Isaacs
PAUL F. ISAACS
Office of General Counsel
Department of Justice
State Office Building
Frankfort, Kentucky 40601
Telephone (502) 564–7554

/s/ Barbara H. Willett
BARBARA H. WILLETT
Office of Attorney General
Special Prosecutors Division
209 St. Clair Street
Frankfort, Kentucky 40601
Telephone (502) 564–2200

COUNSEL FOR DEFENDANTS

/s/ Hancy Jones, III
HANCY JONES, III
Assistant United States Attorney
211 U.S. Courthouse
Louisville, Kentucky 40202
Telephone (502) 583–6294

/s/ Shawn Moore
SHAWN MOORE
United States Department of Justice
Civil Rights Division
Washington, D.C. 20530

**50**

/s/ Adjoa A. Burrow
 ADJOA A. BURROW
 United States Department of Justice
 Civil Rights Division
 Washington, D.C. 20530

/s/ Oliver H. Barber, Jr.
 OLIVER H. BARBER, JR.
 800 Marion E. Taylor Building
 Louisville, Kentucky 40202
 Telephone (502) 585–2101

/s/ Martha A. Fleetwood
 MARTHA A. FLEETWOOD
 United States Department of Justice
 Civil Rights Division
 Washington, D.C. 20530

/s/ Richard H. Burr, III
 RICHARD H. BURR, III
 P. O. Box 120636 Acklen Station
 Nashville, Tennessee 37212
 Telephone (615) 852–5022

AMICUS CURIAE

 COUNSEL FOR EDDYVILLE PLAINTIFFS

 HAVE SEEN AND AGREE:

/s/ Guy Appleton
 GUY APPLETON

/s/ John Bennett
 JOHN BENNETT

/s/ Roy E. Cline
 ROY CLINE

/s/ James Fultz
 JAMES FULTZ

/s/ Clifford R. Hall
 CLIFFORD HALL

/s/ Jimmie Luna
 JIMMIE LUNA

/s/ Donald Moore
 DONALD MOORE

/s/ Jimmy Quinn
 JIMMY QUINN

/s/ Donnie D. Randolph
 DONNIE RANDOLPH

/s/ James C. Coleman
 JAMES COLEMAN

/s/ Robert E. Smith
 ROBERT SMITH

/s/
 JOHN RENEER

EDDYVILLE PLAINTIFF'S COMMITTEE