69 F.3d 537
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
William Carl HUNDLEY, Plaintiff-Appellee,
v.
Philip PARKER, Warden; Patti R. Webb; and Rick Pershing,
Defendants-Appellants.
 No. 95-5399.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1995.
 
 Before: KRUPANSKY, MILBURN, and NELSON, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Defendants Philip Parker, Patti R. Webb, and Rick Pershing appeal the district court's order denying their motion for summary judgment on the basis of qualified immunity in this 42 U.S.C. Sec. 1983 action in which plaintiff William Carl Hundley, an inmate at the Kentucky State Penitentiary at the time of the events at issue, alleged that defendants denied him due process and acted with deliberate indifference to his health and safety by refusing to separate him from another inmate who subsequently caused him physical injury. On appeal, the issues are (1) whether the district court erred in denying defendants qualified immunity because plaintiff did not have a clearly established right to be housed separately from general population inmates after he was transferred to the segregation unit of the prison, and (2) whether the district court erred in denying defendants qualified immunity because plaintiff did not have a clearly established right to be housed separately from an inmate who had previously threatened him if defendants were unaware of that threat. For the reasons that follow, we reverse in part and dismiss in part.
 
 I.
 A.
 
 2
 At the time the alleged facts giving rise to this action occurred, plaintiff William Carl Hundley was an inmate at the Kentucky State Penitentiary ("KSP") in Eddyville, Kentucky. Prior to October 21, 1993, plaintiff was a protective custody inmate, separated from general population inmates for safety reasons. On October 21, 1993, plaintiff was transferred from the protective custody unit to the segregation unit, as a result of a fight with another inmate in the protective custody unit. Inmates in the segregation unit are no longer considered protective custody or general population inmates but are categorized as administrative segregation, administrative control, or disciplinary segregation inmates. After the transfer, plaintiff's status was changed to administrative segregation, a category used for prisoners expected to be in the segregation unit for only a short period of time.
 
 
 3
 When a prisoner is transferred to the segregation unit, his records are checked for conflicts with other inmates in the unit so that the two (or more) inmates can be housed on separate walks. If inmates with conflicts are housed in the same area, they are exercised in different groups. In the absence of a known conflict, prisoners formerly housed as protective custody inmates are co-mingled with former general population inmates.
 
 
 4
 When plaintiff was placed in the segregation unit, defendants assert that plaintiff had no documented conflict with inmate Duane Harper, and plaintiff does not contest this fact. However, on January 6, 1994, plaintiff was assaulted by Harper while he was exercising. Plaintiff attempted to avoid the fight; he reacted to the assault by covering his face while Harper repeatedly struck him. Prison officials ordered Harper to stop the physical attack, but he ignored them. The officers did not intervene but, in accordance with Kentucky prison procedures, they did gather reinforcements and obtain the equipment they needed to enter the exercise area. Harper ultimately ceased the assault without the need for official involvement.
 
 
 5
 Plaintiff states that Harper was provoked to assault him because plaintiff had previously been a protective custody inmate. Plaintiff asserts that Harper began threatening him soon after his transfer to the segregation unit and continued issuing threats against him until the time of the assault. Plaintiff states that he had previously asked the floor officers to transfer him away from Harper in order to protect his safety. He further states that when no action was taken, he wrote a personal letter to defendant Pershing. Defendant Pershing, however, denies that he was ever informed that plaintiff had been threatened by Harper. Defendants admit that they knew that Harper had a history of violence and assaultive behavior.
 
 B.
 
 6
 Plaintiff commenced this action pro se on March 29, 1994, alleging that defendants had violated his rights under the Eighth and Fourteenth Amendments to the Constitution of the United States. Plaintiff named as defendants, Philip Parker, the warden at the prison; Patti R. Webb, the deputy warden; and Rick Pershing, the unit administrator. He sued each defendant in his or her individual and official capacities. Defendants filed a motion for summary judgment on January 9, 1995. The district court entered a memorandum opinion and order denying defendants' motion on February 15, 1995, finding that plaintiff had demonstrated a clearly established right to protection from violence at the hands of another inmate and that defendants were not entitled to qualified immunity. This timely appeal followed.
 
 II.
 A.
 
 7
 Defendants argue that the district court erred in denying them qualified immunity because plaintiff did not have a clearly established right to be housed separately from inmates formerly classified as general population prisoners once he was transferred to the segregation unit of the KSP. Specifically, defendants assert that the consent decree entered in Kendrick v. Bland, 541 F.Supp. 21 (W.D.Ky.1981), reviewed, 659 F.Supp. 1188 (W.D.Ky.1987), aff'd, 843 F.2d 1392 (6th Cir.) and 856 F.2d 196 (6th Cir.1988), on which plaintiff bases his claim, does not create a substantive right entitling a prisoner formerly housed in a protective custody unit to be separated from inmates once housed in the general population unit following a transfer to the segregation unit. Plaintiff argues, however, that defendants' co-mingling of general population and protective custody inmates created a risk of assault that violated his Eighth and Fourteenth Amendments rights.
 
 
 8
 Ordinarily, we review a district court's denial of summary judgment for an abuse of discretion. Hanover Ins. Co. v. American Eng'g Co., 33 F.3d 727, 730 (6th Cir.1994). However, because the district court's denial of summary judgment on the basis of qualified immunity is a matter of law, we review the district court's decision de novo. Williams v. Kentucky, 24 F.3d 1526, 1532 (6th Cir.), cert. denied, 115 S.Ct. 358 (1994); Knight v. Gill, 999 F.2d 1020, 1021-22 (6th Cir.1993) (citing Washington v. Newsom, 977 F.2d 991, 993 (6th Cir.1992), cert. denied, 113 S.Ct. 1848 (1993)).
 
 
 9
 Under Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir.1992) (per curiam); LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir.1993). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " Patton v. Bearden, 8 F.3d 343, 346 (6th Cir.1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 
 10
 The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., 8 F.3d 335, 340 (6th Cir.1993). Conclusory assertions are not enough to allow a nonmoving party to withstand a motion for summary judgment. Moore, 8 F.3d at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted); see Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir.1994).
 
 
 11
 The doctrine of qualified immunity applies to shield government officials performing discretionary duties such as those performed by defendants from liability for civil damages, at least to the extent that the officials' conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have been aware. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Such immunity protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Harlow, 457 U.S. at 806.
 
 
 12
 The ultimate issue in determining the applicability of qualified immunity in this case is whether plaintiff's rights were clearly established when he was transferred to the segregation unit and forced to interact with Harper. In order to conclude that plaintiff's rights were clearly established, we must be satisfied that
 
 
 13
 the contours of the right [were] sufficiently clear that a reasonable official would understand that [his or her conduct] violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 14
 Anderson v. Creighton, 483 U.S. 635, 639-40 (1987) [citations omitted); see Meyers v. City of Cincinnati, 979 F.2d 1154, 1156 (6th Cir.1992). The officials' actions must have lacked " 'objective legal reasonableness.' " J.A. 260. In addition, we must find binding precedent from the Supreme Court, this court, or the Kentucky Supreme Court in order to find that plaintiff's rights were clearly established. Ohio Civil Serv. Employees Ass'n v. Seiter, 858 F.2d 1171, 1177 (6th Cir.1988); Poe v. Haydon, 853 F.2d 418, 424 (6th Cir.1988), cert. denied, 488 U.S. 1007 (1989).
 
 
 15
 In its memorandum opinion denying defendants' motion for summary judgment, the district court found that plaintiff had demonstrated the existence of a clearly established right, namely, the right to be protected from violence at the hands of other inmates. In addition, the district court found that it could not "reach the reasonableness question [of the qualified immunity inquiry] as the defendants failed to indicate which facts demonstrated the absence of a jury issue on the reasonableness issue. Even had they done so, such fact-intensive determinations are most appropriately decided by a jury." J.A. 260. Accordingly, the district court rejected defendants' assertion of qualified immunity and denied their motion for summary judgment.
 
 
 16
 Prison officials have a well recognized duty to protect inmates in their custody from violence caused by other prisoners. Wilson v. Seiter, 501 U.S. 294, 303 (1991); Roland v. Johnson, 856 F.2d 764, 769 (6th Cir.1988). Suffering physical assaults while in prison is not "part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981); see also Farmer v. Brennan, 114 S.Ct. 1970, 1977 (1994). However, plaintiff goes farther, arguing that the consent decree entered in Collins v. Bland, 76-501-L, and subsequently examined in Kendrick v. Bland, 659 F.Supp. at 1195, put defendants on notice that the practice of co-mingling inmates in the segregation unit, who had previously been held in protective custody while in the general population, was violative of plaintiff's right to protection from injury.
 
 
 17
 The Kendrick litigation began in 1976, when a group of prisoners' complaints about unconstitutional conditions at the KSP were consolidated, and the litigants asserted a class action. In 1980, the parties entered into a consent decree in which the defendant prison officials agreed to study problems at the KSP and to develop plans for improving conditions in a variety of areas. Pursuant to the consent decree, the KSP was subject to close judicial scrutiny. Later, in 1986, the parties presented evidence to the district court demonstrating the improvement in conditions at the prison. The district court found that the defendants had implemented policies that complied with the terms of the decree in almost every area previously cited. Thus, in a decision affirmed by this court, the district court relinquished jurisdiction over the KSP.
 
 
 18
 Among the many issues addressed by the Kendrick litigation was the issue of protective custody inmates. During the 1986 hearing to determine the defendants' compliance with the consent decree, the plaintiffs argued that protective custody inmates should be housed at a facility entirely separate from other inmates, a position the defendants had rejected. The district court found such a requirement unnecessary. Furthermore, the district court found that the KSP's policy of giving protective custody inmates privileges nearly identical to those enjoyed by inmates in other areas of the prison was sufficient to bring the facility into compliance with the consent decree. Finally, the district court recognized that the problems inherent in separating prison populations and in dealing with animosities between those populations were administrative problems "better suited for the trained prison official as opposed to a judicial officer." Kendrick, 659 F.Supp. at 1195 (citing Bell v. Wolfish, 441 U.S. 520 (1979)).
 
 
 19
 The district court cited the Kendrick litigation as evidence that prison officials had been aware of problems with co-mingling protective custody and general population inmates since 1976. However, we conclude that this awareness was insufficient to alert defendants that refusing to separate such inmates after they were transferred to the segregation unit, and categorized according to a new classification system, was a violation of the inmates' constitutional rights. Because the district court reviewing the defendants' compliance with the consent decree did not find that protective custody inmates were entitled to anything more than comparable programming, we find no evidence on which to base a conclusion that the terms of the decree put defendants on notice that their policy of co-mingling in the segregation unit was, by itself, violative of plaintiff's rights as a former protective custody inmate.
 
 
 20
 Moreover, we find no language creating a liberty interest in continued separation, nor do we find any mandatory language requiring prison officials to extend the division of inmates into "protective custody" and "general population" groups after the prisoners are assigned to new units that employ different classification schemes. Further, we note that since an inmate is assigned to the segregation unit only after an unforeseen incident necessitates such a transfer, the three classifications used for inmates in the segregation unit are likely to be more indicative of a prisoner's current needs than the status assigned to him at the time of his original incarceration. Although the frequency of altercations between inmates in protective custody and in the general prison population was documented for the district court, the court left the task of resolving such hostilities to experienced prison officials. To that end, defendants employ a system pursuant to which prisoner records are checked for documented conflicts prior to assignment in the segregation unit. The existence of such a system indicates that defendants do not place inmates in the segregation unit without directing some attention to their security concerns.[1]
 
 
 21
 Since the consent decree in Kendrick did not require that inmates in the segregation unit of the KSP be housed separately depending upon their classification prior to entering that unit and because we are unable to locate any precedent suggesting that such a right inures to prisoners once classified as protective custody inmates, we conclude that defendants are entitled to qualified immunity on the ground that there was no clearly established right for plaintiff to be housed separately from inmates who had previously been general population prisoners, at least in the absence of a documented conflict with one of those prisoners. We further conclude that reasonable officials in defendants' positions could not have known that their handling of plaintiff's transfer would violate plaintiff's constitutional rights. See Poe, 853 F.2d at 425. Therefore, the district court erred in not finding that defendants are entitled to qualified immunity as to this issue.
 
 B.
 
 22
 Defendants also argue that they are entitled to qualified immunity because, although plaintiff enjoys a right to protection from other inmates, that right is not applicable in this case because plaintiff cannot show that defendants were deliberately indifferent to the dangerous conditions he faced. We have already concluded that plaintiff enjoyed a constitutional right to be protected by prison officials from violence caused by other inmates. See, e.g., Farmer, 114 S.Ct. at 1976; Walker v. Norris, 917 F.2d 1449, 1453 (6th Cir.1990); Roland, 856 F.2d at 769. However, every injury a plaintiff receives at the hands of another inmate does not create liability for prison officials. When an inmate asserts a claim based on the failure to prevent harm, as plaintiff asserts in this case, liability arises only if two conditions are met: (1) the inmate is incarcerated under conditions that create a substantial risk of serious harm to his health or safety; and (2) the defendant prison officials possess a culpable state of mind. Farmer, 114 S.Ct. at 1977. Thus, it is only "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." Id. at 1974; Wilson, 501 U.S. at 303.
 
 
 23
 In this case, the district court concluded that a genuine issue of material fact existed regarding whether defendants demonstrated the requisite deliberate indifference. J.A. 262. In Johnson v. Jones, 115 S.Ct. 2151 (1995), the Supreme Court held that "a defendant entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Id. at 2159. We therefore conclude that this issue is not appealable.
 
 III.
 
 24
 For the reasons stated, the district court's order denying summary judgment based upon qualified immunity is REVERSED on the issue of plaintiff's right to be housed separately from former general population inmates after being transferred to the segregation unit and defendants' appeal of the district court's denial of summary judgment on the basis of qualified immunity as to plaintiff's right to be protected by prison officials from violence caused by other inmates is DISMISSED because the district court found that there was a genuine issue of material fact as to this issue.
 
 
 
 [1]
 In his complaint, plaintiff states that the consent decree provides: "An inmate who requests protective custody ... shall be placed in administrative segregation on protective custody status ... No member shall be required to re-enter general population." J.A. 15. However, we are unable to locate this language in either the consent decree or the supplemental consent decree. See Kendrick, 541 F.Supp. at 21. Even so, the quoted language does not establish the right to separation for which plaintiff argues. The quoted language does not refer specifically to the classification of prisoners housed in the segregation unit but merely affirms the availability of a classification known as protective custody, which is treated as a form of administrative segregation even though it is not part of the segregation unit per se. Furthermore, the language states that a prisoner cannot be forced to re-enter the general population. Plaintiff was not housed among the general population inmates; instead, he was placed in an entirely new unit, one which happened to include prisoners who had formerly been among the KSP's general population inmates